UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Nicholas Martino, et al.** : | |
| : | |
| Plaintiffs : | Civil Action No. |
| : | |
| v. : | 02-CV-4633 |
| : | |
| **Richard Craft, et al.** : | |
| : | |
| Defendants. : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)**

**INTRODUCTION.**

Plaintiffs, Nicholas Martino and Marybeth Martino, in her own right and as parent and natural guardian of Nicole Martino, a minor, brought this admiralty action against defendants, Richard Craft ("Craft") and John Hammerschmidt ("Hammerschmidt") for injuries and damages sustained by Nicholas Martino and his daughter, Nicole, due to the negligent operation of a watercraft known as a "wave runner" on the Sassafras River, a navigable waterway of the United States, by Craft and the negligent entrustment of the wave runner by Hammerschmidt to Craft. Defendants, just prior to trial, now seek to dismiss the Complaint, pursuant to F.R.C.P. 12(b)(1), alleging that the accident was not sufficiently related to "traditional maritime activity" to support this Court's admiralty jurisdiction. Defendants' argument, which has been previously rejected by the United States Supreme Court, the Third Circuit and courts of other Circuits, is based on a misapplication of the relevant standard and improperly seeks to impose jurisdictional

requirements which the law does not.  As the federal courts have repeatedly determined that the collision of watercraft, including pleasure craft similar to the wave runners involved in this case, is governed by federal admiralty jurisdiction, defendants' Motion should be denied, in its entirety.

## COUNTER-STATEMENT OF FACTS.

Late in the afternoon on July 15, 2000, during a visit at Craft's vacation home in Galena, Maryland, Nicholas, Nicole, and Craft and his son, took two wave runners, both owned by Hammerschmidt, out on the Sassafras River.  At the end of their ride, Nicholas and Craft met at a point up river from the Craft residence and stopped, side by side parallel to the river bank, to discuss returning to the house for dinner.  The Martinos' wave runner was situated to the right of Craft, approximately 20 feet from the south bank of the River.  [Martino Dep. at 50-1 (Exhibit "A").]  After discussing returning to the house, Craft told Nicholas, who was unfamiliar with that particular waterway, he would have to make a left turn toward the house, requiring Nicholas to cross in front of Craft, as the bank was too close and the water too shallow for Nicholas to maneuver the wave runner in the direction of the Craft residence.  [Id. at 53-55.]

Nicholas Martino then began to proceed forward as advised by Craft and make a left turn in order to head down river.  As he was crossing in front of Craft's wave runner, Craft, abruptly and without warning, accelerated and crashed his wave runner into the left side of the Martinos' wave runner, striking Nicholas' leg with the bow of the Craft wave runner.  [Id. at 55, 70.]  The collision crushed Nicholas' left leg, causing a severe "type

three" open tibia fracture.  [Id. at 112 and Exhibit 7.]  Nicole was also injured by the impact of the Craft wave runner. [Martino Dep. at 119.]  Bleeding profusely, and with a portion of his tibia bone protruding through the skin, Nicholas had to reposition the bone back into his leg and subsequently drive his wave runner back to the Craft residence.  [Id. at 87-88.]  A local EMT team performed emergency treatment until Nicholas could be taken by medivac helicopter to the R. Adams Crowley Shock Trauma Center in Baltimore, Maryland, where he spent the next several weeks receiving multiple surgical procedures in an effort to save his leg.  [Id. at 107-08, 110-15.]

**A R G U M E N T**

**A.   Standard Of Review.**

"[T]he standard for surviving a Rule 12(b)(1) motion is lower than that for a Rule 12(b)(6) motion."  Gould Electronics, Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)(citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2389 (1991).  "A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'"  Gould, 220 F.3d at 178.  "A complaint may be dismissed for lack of subject matter jurisdiction on a 12(b)(1) motion only if it appears to a certainty that a colorable claim cannot be asserted."  Kalian at Poconos, LLC v. Saw Creek Estates Community Association, Inc., 2003 U.S.Dist.LEXIS 13571 at *16 (M.D.Pa. August 5, 2003)(citing Smith v. Social Security Administration, 54 F.Supp.2d 451, 453 (E.D.Pa. 1999)).

"Moreover, dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"  Fitzgerald v. Vogel, 2003 U.S.Dist.LEXIS 1343 at *5 (E.D.Pa. January 29, 2003)(quoting Kulick v. Pocono Downs Racing Association, 816 F.2d 895, 899 (3d Cir. 1987); Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666, 94 S. Ct. 772 (1974)).

    **B.   The Complaint Falls Within This Court's Admiralty Jurisdiction.**

Contrary to defendants' argument based on a misapplication of the relevant standard, this Court has jurisdiction pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1333, as the events pertaining to this action occurred on the Sassafras River, a navigable waterway, and were significantly related to traditional maritime activity.  Section 1333(1) states, in relevant part:

> "The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
>
> "(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

Further, "[f]or a tort to be considered maritime, it must meet two tests:  the situs of the tort must be maritime (the location test) and the tort must bear a significant relationship to traditional maritime activity (the nexus test)."  Carey v. Bahama Cruise Lines, 864 F.2d 201, 207, n.4 (1st Cir. 1988)(citing

-4-

Foremost Insurance Company v. Richardson, 457 U.S. 668, 673, 102 S.Ct. 2654 (1982); Austin v. Unarco Industries, Inc., 705 F.2d 1, 8-9 (1st Cir.), cert. denied, 463 U.S. 1247, 104 S.Ct. 34 (1983).[1]  "The nexus test focuses on four factors:  the function and role of the parties, the types of vehicles and instrumentalities involved, the causation and type of injury, and traditional concepts of the role of admiralty law." Carey, 864 F.2d at 207, n.4 (where the court determined that because injury to cruise ship passenger caused by sliding gangway that connected the cruise ship to a tender was a "uniquely maritime injury," the court did "not need to analyze each factor in detail to conclude that this tort has a significant relationship to maritime activity.").  "[N]otwithstanding a lack of any direct connection to commercial activity, 'the negligent operation of a vessel on navigable waters ... [has] a significant nexus to traditional maritime activity to sustain admiralty jurisdiction.'" Szollosy v. Hyatt Corporation, 208 F.Supp.2d 205, 209 (D.Conn. 2002)(quoting Foremost Insurance Co. v. Richardson, 457 U.S. 668, 674-75, 102 S.Ct. 2654 (1982)).

---

[1] Defendants do not dispute that the wave runner accident at issue in this case occurred on a "navigable waterway" and, therefore, meets the location test for admiralty jurisdiction. [Defendants' Motion To Dismiss at ¶ 6.]  Indeed, federal courts have held, in cases similar to this, that accidents involving pleasure craft on bodies of water confined within one state satisfy the location test and, therefore, implicate admiralty jurisdiction.  See Mullenix v. United States, 984 F.2d 101 (4th Cir. 1993)(injuries to boater occurring when boat in which he was a passenger went over a dam on an area of the Potomac River located entirely in Maryland, not subject to the ebb and flow of the tide, supporting recreational traffic only, and which was patrolled only by the Maryland Department of Natural Resources satisfied admiralty jurisdiction).

Defendants misunderstand the nature of the jurisdictional inquiry under the nexus test; their argument improperly focuses on the specific facts of the accident to suggest the absence of any <u>actual</u> impact on maritime commerce, rather than on the <u>potential</u> to affect maritime activity.

However, the Third Circuit has recognized, under facts similar to this case, that accidents involving recreational water craft, including jet skis, satisfy the nexus test, even where the collision does not threaten maritime commerce. In <u>Calhoun v. Yamaha Motor Corporation</u>, 216 F.3d 338 (3d Cir.), <u>cert. denied</u>, 531 U.S. 1037, 121 S.Ct. 627 (2000), the operator of a jet ski crashed into a boat anchored off a hotel, resulting in the death of the rider. The Court characterized the jet ski as "a type of pleasure craft that is almost exclusively used for recreational purposes." 216 F.3d at 345. However, relying on two United States Supreme Court decisions applying the standards for determining whether a tort is "maritime," <u>Richardson</u>, <u>supra</u>, and <u>Sisson v. Ruby</u>, 497 U.S. 358, 110 S.Ct. 2892 (1990), the Third Circuit held that "so long as the incident in question, and the vehicles utilized therein, bears <u>some</u> relation to traditional maritime activity and <u>could</u>, in any way, impact upon the flow of maritime commerce, admiralty jurisdiction is proper." 216 F.3d at 345 (emphasis added). The Court of Appeals stated:

> "The [Supreme] Court has continuously directed that in examining an incident's nexus to maritime commerce for the purposes of admiralty jurisdiction, a court must look not only to the specific impact that the particular incident had on such commerce, <u>but to 'the potential impact of [the] incident by examining its general character</u>.' <u>Sisson</u>, 497

-6-

> U.S. at 363. For instance, the Richardson Court determined that although the collision of those particular pleasure boats in the Amite River did not threaten maritime commerce, <u>if the same collision were to have occurred</u> in the mouth of the St. Lawrence River, the impact on maritime commerce would have been serious. See Richardson, 457 U.S. at 675. This latter conclusion, the Court held, provided the District Court with admiralty jurisdiction. See id." 216 F.3d at 345, n. 11 (emphasis added).

Thus, the Third Circuit determined that the accident bore "some impact, however remote, on maritime commerce":

> "In particular, the vessel that Natalie struck <u>could have been</u> a commercial boat, or the ensuing investigation into the crash <u>could have</u> made commercial navigation in and around the marina difficult. Indeed, the accident at issue here is virtually identical to the accident that occurred in Richardson, and as such, we hold that we properly exercise jurisdiction over this matter pursuant to the admiralty provisions of 28 U.S.C. § 1333(1)." Id. at 345 (footnote omitted and emphasis added).

In Richardson, two boats being used for recreational purposes collided on the Amite River in Louisiana. Neither boat had ever been used for commercial purposes (including at the time of the accident), and none of the passengers on either boat were engaged in any kind of traditional maritime activity. There also was no other instrumentality, such as a buoy, barge or oil drilling apparatus, involved in the accident that had even a minor relationship to "admiralty" or "commerce." 457 U.S. at 671. Notwithstanding the lack of any connection to commercial activity, the Supreme Court reversed the dismissal of the

-7-

complaint for lack of admiralty jurisdiction and held that there was a sufficient nexus to traditional maritime activity based, in a general sense, on the "potential[ly] disruptive impact of a collision between boats on navigable waters."  457 U.S. at 675 (emphasis added).  The Supreme Court supported its finding with a hypothetical, describing the likely effects of the same collision had it occurred at the mouth of the St. Lawrence Seaway, an area heavily traveled by commercial vessels, even though the place where the accident actually occurred was "seldom, if ever, used for commercial traffic."  Id. at 670, n.2.  The Court explained:

> "Although the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce, petitioners take too narrow a view of the federal interest sought to be protected.  The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually engaged in commercial maritime activity.  This interest can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct.  The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce.  For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity.  Furthermore, admiralty law has traditionally been concerned with the conduct alleged to have caused this collision by virtue of its 'navigational rules -- rules that govern the manner and direction those vessels may rightly move upon

>the waters.' Executive Jet, 409
>U.S. at 270, 93 S.Ct. at 505. The
>potential disruptive impact of a
>collision between boats on
>navigable waters, when coupled with
>the traditional concern that
>admiralty law holds for navigation,
>compels the conclusion that this
>collision between two pleasure
>boats on navigable waters has a
>significant relationship with
>maritime commerce." 457 U.S. at
>674-5 (footnote omitted; emphasis
>original.)

In Sisson, the Supreme Court held that admiralty jurisdiction applied to a cause of action relating to a fire that started on a pleasure yacht and proceeded to damage several other boats and the marina at which the yacht was docked. The Supreme Court noted that the "relevant activity" under the nexus test is defined "not by the particular circumstances of the incident, but by the general conduct from which the incident arose." 497 U.S. at 364. The Court reasoned that, "[w]ere courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question." 497 U.S. at 365. Rather than focus on the details of the accident (the cause of the fire) to determine whether the incident had a substantial relationship to maritime activity, the Supreme Court simply defined the relevant activity as "the storage and maintenance of a vessel at a marina on navigable waters." Id. Thus, the Supreme Court concluded that "[c]learly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the [nexus]

aspect of the test." Id. at 367. Indeed, the Supreme Court rejected the same argument raised by defendants here, noting that "[o]ur cases thus lead us to eschew the fact-specific jurisdictional inquiry urged on us by respondents." 497 U.S. 363-64. The Court reasoned:

> "Respondents' only argument to the contrary is that the potential effect on maritime commerce in this case was minimal because no commercial vessels happened to be docked at the marina when the fire occurred. This argument misunderstands the nature of our inquiry. We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the actual effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the Ultorian more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features -- a fire on a vessel docked at a marina on navigable waters -- plainly satisfy the requirement of potential disruption to commercial maritime activity." 497 U.S. at 363.

In reaching its determination, the Supreme Court noted that "[t]he need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." 497 U.S. at 367.

Finally, as here, in Szollosy v. Hyatt Corporation, a young child was placed on a jet ski located at a resort beach, when the jet ski propelled forward and struck the breakwater. The Court observed that "[a] young child's allegedly untrained and unaccompanied ride of a jet ski in navigable waters clearly poses a hazard to navigation." 208 F.Supp.2d at 212. The Court then held:

> "The concern that admiralty law be uniform and predictable also supports the exercise of admiralty jurisdiction in the instant case, notwithstanding it is alleged that Charles Dean Szollosy was only on the jet ski for a brief moment before his injuries occurred and that this case involves the allision of a jet ski and a stationary object rather than the collision of two vessels. 'In the cases after Executive Jet, the Court stressed the need for a maritime connection, but found one in the navigation or berthing of pleasure boats, despite the facts that the pleasure boat activity took place near shore, where States have a strong interest in applying their own tort law, or was not on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime torts.' Jerome B. Grubart, Inc., 513 U.S. at 543, 115 S.Ct. 1043 (citing Sisson, 497 U.S. at 367, 110 S.Ct. 2892. Foremost, 457 U.S. at 675, 102 S.Ct. 2654). Indeed, the federal interest in protecting maritime commerce requires that 'all operators of vessels on navigable waters are subject to uniform rules of conduct.' Foremost, 457 U.S. at 675, 102 S.Ct. 2654; see also Moragne v. States Marine Line, Inc., 398 U.S. 375, 401-02, 26 L.Ed.2d 339, 90 S.Ct. 1772 (1970)('[F]ederal admiralty law should be a system of law

-11-

>      coextensive with, and operating
>      uniformly in, the whole country.')
>      (internal quotations omitted);
>      <u>Friedman v. Cunard Lines Ltd.</u>, 996
>      F.Supp. 303, 309-313 (S.D.N.Y.
>      1998)(referring to the importance
>      of the 'uniform administration of
>      admiralty actions')."  208
>      F.Supp.2d at 213 (footnote
>      omitted.)

Based on <u>Richardson</u>, <u>Sisson</u> and <u>Calhoun</u>, the very cases defendants cite in their Motion To Dismiss, there can be no serious dispute that this accident bears a "significant relationship to traditional maritime activity."  As in <u>Calhoun</u>, the wave runners operated by Martino and Craft were vessels being navigated on, <u>what</u> <u>defendants</u> <u>concede</u>, was a navigable waterway.[2]  Quite simply, and as defendants also concede, there is no meaningful distinction between this accident and those in the cited cases.  [<u>See</u> Defendants' Memorandum at 5.]  As those cases instruct, the potential impact of this accident is clear, given the general nature of the accident, <u>i.e.</u> the collision of two watercraft on a navigable waterway.  Defendants' Motion, which is based on an argument previously rejected by the Supreme Court is, at best, a misguided eleventh-hour procedural maneuver which misapplies the relevant standard.  It is completely irrelevant that the wave runners and the dock at which they were kept were privately owned, that the wave runners remained operable after the collision, the accident occurred "less that a half mile from the private dock" or that "there is no evidence that the incident required entry upon the Sassafras River to

---

[2]The word "vessel" includes "every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3.

perform medical or investigative functions." [Defendants' Memorandum of Law at 4-5.] As in Richardson, had this accident occurred at a nearby marina or in the Chesapeake Bay, the impact on maritime activity could have been severe.[3] Moreover, Maryland has adopted boating regulations applicable to the Sassafras River and which limit permissible speeds and other boating operations, and reflect a significant amount of boating traffic on the River itself. [See Code of Maryland Regulations, COMAR 08.18.01.04.]

Defendants' attempt to distinguish Szollosy v. Hyatt Corporation, supra, where the court determined that the collision of a jet ski into a stationary breakwater was governed by federal admiralty law, is unavailing. Defendants may "respectfully disagree," but cannot explain how it was wrongly decided or otherwise inapplicable.

Plaintiffs' claims here are based on Craft's negligent operation of his wave runner on a navigable waterway. The same federal interest in uniformity of the rules of conduct on navigable waters as reviewed in the cited cases clearly supports admiralty jurisdiction in this case. Granting defendants' Motion would frustrate this interest, which strikes at the heart of the very purpose of federal admiralty jurisdiction.

---

[3]According to its web site, Duffy Creek Marina which on a map is located close to Galena, Maryland near where the accident occurred, claims to have a "sheltered harbor on the Sassafras", and is 8.5 nautical miles from the Chesapeake Bay, placing this accident closer to the Chesapeake Bay than the accident in Richardson was to the St. Lawrence Seaway. [See Duffy Creek Marina web site, Exhibit "B".] Additionally, the Chesapeake Bay Boating web directory lists eight marinas located on the Sassafras River. [See Chesapeake Bay Boating web site, Exhibit "C."]

## **CONCLUSION.**

Based on the foregoing, plaintiffs request that this Court enter an Order denying defendants' Motion To Dismiss Pursuant To F.R.C.P. 12(b)(1) in its entirety, and retain jurisdiction over this matter.

**OF COUNSEL**:
Pelino & Lentz, P.C.
One Liberty Place
1650 Market Street
Thirty-Second Floor
Philadelphia, PA 19103-7393
215-665-1540

Howard A. Rosenthal
Darin J. McMullin
Kevin C. Rakowski
 Attorneys for Plaintiffs,
  Nicholas Martino and Nicole
  Martino, a minor, by her
  parent and guardian,
  Marybeth Martino and
  Marybeth Martino, in her
  own right